*Brian Wynne and Karen Wynne v. Comptroller of Maryland*
No. 12, September Term 2019


**Taxation – Tax Refunds – State Budget Legislation – Dormant Commerce Clause**. A previous Court of Appeals decision held that the Maryland statute providing a credit against the Maryland income tax liability of a Maryland resident based on income taxes paid to other states on income earned in those states violated the dormant Commerce Clause of the federal Constitution. That decision held that the statute could be rendered constitutional by amending the credit provision to apply it more broadly, among other ways. That decision was appealed to the Supreme Court. While the appeal was pending, the General Assembly, in anticipation that the Supreme Court would affirm the decision, enacted State budget reconciliation and finance acts that broadened the tax credit, authorized refunds computed on a retroactive application of the credit, and specified that the interest rate paid on those refunds would be pegged to the prime rate of interest charged by banks (instead of the minimum 13% interest rate that the tax code already provided for certain refunds). After the Supreme Court affirmed the Court of Appeals decision, payment of refunds and interest in accordance with the remedial legislation enacted by the General Assembly did not violate the dormant Commerce Clause.

IN THE COURT OF APPEALS
OF MARYLAND

No. 12

September Term, 2019

_____

BRIAN WYNNE AND KAREN WYNNE

V.

COMPTROLLER OF MARYLAND

_____

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth,
Greene, Jr., Clayton
  (Senior Judge, Specially
  Assigned)

JJ.

_____

Opinion by McDonald, J.

_____

Filed: June 5, 2020

This appeal is the latest chapter in litigation between Appellants Brian and Karen Wynne and Appellee State Comptroller. The litigation began when the Wynnes challenged an aspect of the Maryland income tax law – in particular, the credit allowed by State law against a Maryland resident's income tax liability based on taxes the resident paid to other states on income derived from those states. The Wynnes argued that the Maryland tax scheme discriminated against interstate commerce and thus violated what is known as the dormant Commerce Clause of the federal Constitution. Both this Court and the Supreme Court, in closely divided decisions, agreed with that argument.

In response, the General Assembly amended the Maryland tax code to comply with the court decisions, authorized the Comptroller to pay refunds to those taxpayers affected by the provision held to be invalid, and provided for the State to pay interest on those refunds at a rate pegged to the prime rate used by banks, but less than the 13% interest rate paid on certain other refunds.

After the Comptroller issued a refund to the Wynnes in compliance with the legislation passed by the General Assembly, the Wynnes appealed, seeking the higher rate of interest and arguing, among other things, that the interest rate set by the General Assembly violated the dormant Commerce Clause. After an administrative ruling in the Wynnes' favor, the Circuit Court for Anne Arundel County held that the General Assembly's action did not violate the dormant Commerce Clause. We agree.

# I

## Legal Landscape

This case concerns the rate of interest paid on certain income tax refunds. The refunds were authorized, and the interest rate was set, in budget-related bills passed by the General Assembly. The dispute in this case concerns how the dormant Commerce Clause of the federal Constitution may constrain the choices made by the General Assembly when it authorized those refunds and established an interest rate for the refunds. To set the table, we begin with some basic principles.

### A.    *Tax Refunds and Interest*

Under the common law, a payment voluntarily made to the State, even if made in error, could not be recovered unless a statute specifically authorized a refund – a principle known as the "voluntary payment doctrine." *See Brutus 630, LLC v. Town of Bel Air*, 448 Md. 355, 359-63 (2016); *see also White v. Prince George's Co.*, 282 Md. 641, 651-52 (1978). To mitigate the perceived harshness of this doctrine, the General Assembly has enacted various statutes authorizing the payment of refunds for mistaken, erroneous, or illegal payments made to the State. *Id*.

Among the statutes allowing for refunds are the laws relating to tax refunds.[1] A taxpayer who erroneously pays, or is wrongfully assessed, more income tax than is due may make a claim for a refund of the amount of the overpayment. Maryland Code, Tax-

---

[1] In some circumstances, due process considerations may require a state to provide a tax refund or take other action to rectify a constitutional violation. *See* Part IV.B.1 of this opinion.

General Article ("TG"), §13-901(a), (c).  The claim must be filed within the period allowed by statute.  TG §13-1104.  In certain circumstances specified by statute, the refund is to be paid with interest.  *See Comptroller v. Fairchild Indus., Inc.*, 303 Md. 280, 284 (1985) (payment of interest on tax refund is a "matter of grace" that must be authorized by legislative enactment).

The State pays interest with respect to a claim for refund of an overpayment of income tax only in limited circumstances.  Indeed, it seems safe to say that the vast majority of income tax refunds in Maryland are paid without interest.[2]  For example, no interest is paid when money is withheld from a worker's pay for income tax, the withholdings exceed the worker's tax liability, and a refund is paid after a return is filed.  *See* TG §13-603(b)(2)(ii) (no interest payable for excess withholding).  With respect to other refunds of income tax payments, no interest is to be paid if the overpayment is a result of an error or mistake of the taxpayer that is not attributable to the State.  TG §13-603(b)(2)(i).  Even when interest is payable on a tax refund, it begins to accrue only at 45 days after a claim is made for the refund.  TG §13-603(a).  In other words, no interest is paid if the refund is made within 45 days of the claim.

For those circumstances in which the General Assembly has authorized the payment of interest on tax refunds, it has periodically adjusted the rate of interest.  When the State

---

[2] The federal government similarly does not pay interest on tax refunds to individuals, unless the IRS takes more than the administratively prescribed time (typically 45 days) to generate the refund after a tax return is filed.  *See* IRS – Interest for Individuals, available at https://perma.cc/8265-HWXH.

3

income tax law was first enacted in 1937, that law provided for payment of 6% interest when the refund related to an overpayment that "result[ed] from an error not due to the fault of the taxpayer." Maryland Code, Article 81, §242 (1937).[3] Over the years as inflation has waxed and waned, the General Assembly has, at various times, increased the rate of interest, reduced it, or pegged it to a particular benchmark. *See, e.g.*, Chapter 139, Laws of Maryland 1975 (increasing rate of interest to 9%); Chapter 615, Laws of Maryland 1982 (rate of interest to be set in relation to "average investment yield on State money"); Chapter 322, Laws of Maryland 2016 (gradually reducing minimum rate of interest).

Pertinent to this case, in 2006, the General Assembly amended the statute to increase the interest rate on income tax refunds to a minimum of 13%. Chapter 587, Laws of Maryland 2006, *codified at* TG §13-604(b) (2006).[4] A decade later, the General Assembly amended that statute to gradually reduce the minimum rate of interest on tax refunds. Chapter 322, Laws of Maryland 2016.

---

[3] *See* Chapter 11, §8, Special Session, Laws of Maryland 1937 (enacting income tax law).

[4] The 2006 legislation set the rate of interest at "the greater of" 13% or three percentage points above the prime rate of interest charged by banks. Another aspect of that legislation was to equate the interest rate paid on those refunds for which interest was authorized with the interest rate to be paid on moneys owed to the State. Previously, in Maryland, a higher interest rate was charged on moneys owed to the State than paid on refunds, as is the case under federal tax law and the law of a number of other states. *See, e.g., Shop Talk: Are State Tax Interest Rates a Secret Weapon for Eliminating State Deficits*, 119 J. Tax'n 144 (2013). The policy underlying that difference is presumably to incentivize the filing of timely and accurate tax returns.

As we shall see, the General Assembly provided specific direction as to the payment of refunds in situations such as that of the Wynnes, as well as the rate of interest to be paid on any such refunds. As we shall also see, that direction came in annual budget-related bills.

## B.      *Balancing the State Budget with the "BRFA"*

Income tax proceeds and income tax refunds are part of the revenues and expenditures, respectively, that comprise the State budget. Like many state constitutions[5] – and in contrast to the federal Constitution – the Maryland Constitution requires that the State budget be balanced. This requirement applies both when the budget is proposed by the Governor, and when it is enacted by the General Assembly. Maryland Constitution, Article III, §52(5a).

Under the executive budget system set forth in the State Constitution, the Governor submits to the General Assembly a proposed State budget in a Budget Bill that is to contain "a complete plan of proposed expenditures and estimated revenues" for the next fiscal year. Maryland Constitution, Article III, §52(3). With limited exceptions, the General Assembly may only reduce items of expenditure. *Id*., §52(6). Upon its enactment by the General Assembly, the Budget Bill becomes law without further action by the Governor.[6] *Id*.; *see*

---

[5] *See* Ronald K. Snell, State Constitutional and Statutory Requirements for Balanced Budgets, available at https://perma.cc/6KSE-CQ3P**.**

[6] *See, e.g.*, Chapter 19, Laws of Maryland 2020.

*generally* Richard E. Israel, A History of the Adoption of the Maryland Executive Budget Amendment (March 5, 2004), available at https://perma.cc/SP26-HJDM**.**

To help carry out the constitutional directive to balance the budget, in recent decades, the Governor has frequently proposed, and the General Assembly has enacted, additional legislation specifically designed to complement the estimates of revenues and expenditures in the Budget Bill to ensure that the budget is balanced.  Such a bill often carries a title such as the "Budget Reconciliation and Financing Act" – or "BRFA" for short.[7]  Such a bill combines a variety of measures for limiting expenditures that State law would otherwise require – *e.g.*, altering statutory spending formulas or spending mandates – or increasing revenues beyond what would otherwise be generated by existing law – *e.g.*, increasing taxes or fees or transferring funds from special funds to the general fund on a one-time basis – thereby eliminating a gap that might otherwise exist between expenditures and revenues under the Budget Bill alone.[8]  A BRFA is enacted after the enactment of the Budget Bill to which it pertains.[9]

---

[7] *See, e.g.*, Budget Reconciliation and Financing Act of 2020, Chapter 538, Laws of Maryland 2020.  A BRFA is typically introduced as an "administration bill" at the request of the Governor.  *See Blackstone v. Sharma*, 461 Md. 87, 126 n.19 (2018).

[8] Typically, the Governor proposes, and the General Assembly enacts, a third budget-related bill known as the Capital Budget Bill, which concerns longer-term capital projects and is regarded as a Supplementary Appropriation Bill governed by Article III, §52(8) of the State Constitution.  *See, e.g.*, Chapter 537, Laws of Maryland 2020.

[9] Of the three budget-related bills, only the Budget Bill itself is mandated by the State Constitution and not subject to a gubernatorial veto.  Maryland Constitution, Article III, §52(5) ("The Governor shall deliver … the Budget and a bill for all the proposed appropriations [to the General Assembly].").

The Maryland Constitution requires that any bill "embrace but one subject." Maryland Constitution, Article III, §29. In theory, the single subject of a BRFA is the balancing of the State budget. *See, e.g.*, Bill Review Letter for Senate Bill 192 (2020 BRFA) (April 28, 2020) at p. 2.

## C. The Dormant Commerce Clause

State fiscal laws are constrained in certain respects by the federal Constitution. The Constitution expressly authorizes Congress "[t]o regulate Commerce . . . among the several States" – a provision referred to as "the Commerce Clause." Article I, §8, cl. 3. The Supreme Court has long recognized that the Commerce Clause necessarily contains a "negative implication" – *i.e.*, that states may not discriminate against interstate commerce without congressional approval. This negative implication has come to be known as the "dormant Commerce Clause."[10] This interpretation of the Commerce Clause strikes at "one of the chief evils that led to the adoption of the Constitution" – economic protectionism by states that would burden interstate commerce. *See Comptroller v. Wynne*, 135 S.Ct. 1787, 1794 (2015) (citing The Federalist Nos. 7, 11 (Alexander Hamilton), and 42 (James Madison)).

---

[10] The term "dormant" generally means "inactive" or "asleep." Given the frequency with which this constitutional doctrine is invoked to challenge state legislation, it is, as some have characterized it, "anything but dormant." *Direct Marketing Assn. v. Brohl*, 814 F.3d, 1129, 1148 (10th Cir. 2016) (Gorsuch, J., concurring). The doctrine is also referred to, perhaps more accurately, as the "negative Commerce Clause." *See, e.g.*, *South Dakota v. Wayfair, Inc.*, 138 S.Ct. 2080, 2100 (2018) (Thomas, J., concurring*); Frey v. Comptroller*, 422 Md. 111, 142 (2011).

Justice Robert Jackson once noted that the Commerce Clause "is one of the most prolific sources of national power and an equally prolific source of conflict with legislation of the state [as] it does not say what the states may or may not do in the absence of congressional action, nor how to draw the line between what is and what is not commerce among the states." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534-35 (1949). It has thus fallen to the Supreme Court to give meaning to the dormant Commerce Clause as one of the "great silences of the Constitution." *Id.* However, not all justices have warmed to the task. *See Comptroller v. Wynne*, 135 S.Ct. at 1808 (Scalia, J., dissenting) (characterizing dormant Commerce Clause as a "judicial fraud").

## II

### The Prequel

#### A.    *The Wynne's 2006 Pass-Through Income*

During the period relevant to this case, Brian and Karen Wynne were a married couple who resided in Howard County, Maryland.[11] During 2006, they received significant income as a result of Mr. Wynne's position as president of Maxim Healthcare Services, Inc. ("Maxim"), a nationwide medical staffing company, and his partial ownership of Maxim. Maxim was organized as a Maryland corporation that elected to be treated as a Subchapter S corporation under the Internal Revenue Code. As such, Maxim passed its

---

[11] Many of the facts recited in this part of the opinion are derived from a stipulation of facts dated September 2, 2016, filed by the parties in the Maryland Tax Court and included in the record of this case.

8

income through to its owners, such as Mr. Wynne, without that income being taxed at the corporate level.[12]

With respect to tax year 2006, much of Maxim's income was generated by operations outside Maryland and was also taxed by the states in which it was earned. Because they derived income from Maxim's operations in many states, the Wynnes filed state income tax returns for the 2006 tax year and paid income taxes on pass-through income in 39 other states in which Maxim operated. As Maryland residents, the Wynnes also reported that income on their 2006 Maryland income tax return.

## B.     Tax Credit for Out-of-State Income Taxes as of 2006

With respect to tax year 2006, the Maryland income tax law included two features that led the Wynnes to challenge the constitutionality of the tax code. First, as remains true today, the income tax was comprised of two components – a "state income tax" and a "county income tax," sometimes called the "piggyback tax," that varies according to the county of the taxpayer's residence.[13] TG §10-101 *et seq.* The State Comptroller collects the entire income tax and remits the county portion to the appropriate county.

---

[12] Under the Internal Revenue Code, a shareholder in a Subchapter S corporation reports the share of income and losses on the shareholder's personal federal income tax return and, in this way, the income is characterized as having "passed through" to its owners "as if such item were realized directly from the source from which realized by the corporation." 26 U.S.C. §1366(b). Maryland has adopted similar tax treatment for Subchapter S corporation income reported by shareholders on their personal state income tax returns. TG §10-104(6).

[13] Nonresidents who earn income in Maryland pay a "special nonresident tax" in lieu of the county portion of the income tax, which is set at a rate equal to the lowest county tax rate. TG §10-106.1.

Second, as in many other jurisdictions, Maryland law provides a tax credit for income taxes paid on the same income in other jurisdictions. As of 2006, that tax credit was applied against the state portion of the Maryland income tax, but it was not applied against the county portion of the Maryland income tax. TG §10-703(a) (2015).

## C.     *The Wynnes Challenge the Maryland Tax Credit Scheme*

On their 2006 Maryland income tax return, the Wynnes reported their "pass-through" income from Maxim and claimed a tax credit for income taxes paid in other states on both the state and county portions of their Maryland income tax return. Consistent with the State income tax law at that time, the Comptroller disallowed the credit claimed as to the county income tax and issued a tax assessment against the Wynnes. The Wynnes sought review in the Maryland Tax Court. With a minor exception, the Tax Court upheld the Comptroller's decision. While the matter was on appeal, the Wynnes paid the assessment.

The Wynnes then pursued judicial review in the Circuit Court for Howard County. The Circuit Court held that the absence of a credit with respect to the county portion of the Maryland income tax meant that the Maryland tax credit scheme violated the dormant Commerce Clause. In a divided decision, this Court agreed with the Circuit Court, as did the United States Supreme Court in a decision involving an unusual 5-4 split.[14] *Comptroller v. Wynne*, 431 Md. 147 (2013), *aff'd*, 575 U.S. 542 (2015).

---

[14] Justice Alito wrote the majority opinion, which was joined by the Chief Justice, Justice Kennedy, Justice Breyer, and Justice Sotomayor. Three dissenting opinions were authored or joined by Justice Scalia, Justice Thomas, Justice Ginsburg, and Justice Kagan.

10

Both this Court and the Supreme Court held that extension of the tax credit to the county portion of the income tax would cure the constitutional defect, but both decisions also acknowledged that there might be other ways of adjusting the State income tax law that would avoid the sort of discrimination against interstate commerce forbidden by the dormant Commerce Clause.  431 Md. at 189; 135 S. Ct. at 1806.

## D.    *Legislative Response*

While the case was pending in the Supreme Court, the General Assembly anticipated that the Supreme Court might affirm this Court's decision and responded in three significant ways:  (1) amending the Maryland tax code to allow a tax credit against the county portion, as well as the state portion, of the Maryland income tax for income taxes paid in other states; (2) providing for the payment of refunds with respect to prior tax years as a result of the *Wynne* decision; and (3) setting the annual rate of interest paid on those tax refunds.  The General Assembly took those actions as part of the BRFAs in 2014 and 2015.  *See* Chapter 489, §§4, 26, 27, Laws of Maryland 2015; Chapter 464, §§16, 20, Laws of Maryland 2014.[15]

---

[15] Other states also reacted to the Supreme Court's decision by changing their treatment of tax credits for income taxes paid to another state.  *See, e.g.*, Ind. Code Ann. §6-3.5-7 (providing credit for out-of-state tax paid against the then in-effect Indiana county economic income tax); Kan. Stat. Ann. §79-32,111(a) (applying tax credits towards local income taxes); *see also* https://perma.cc/3SAL-T7NN (explaining change in practice in Iowa with respect to tax credits and availability of refunds in light of the *Wynne* decision).

1.      2014 BRFA

During the 2014 session of the General Assembly, the Governor proposed, and the General Assembly ultimately enacted, a BRFA to help balance the budget bill for fiscal year 2015.  Chapter 464, Laws of Maryland 2014 ("2014 BRFA").  As originally proposed by the Governor, the bill relaxed some limitations on the use of special funds, increased the portion of certain revenues directed into the State's general fund, transferred a portion of the accumulated funds in certain special funds to the State's general fund, and reduced certain mandated expenditures under existing law.  Senate Bill 172 (2014), first reader.[16]

The bill was amended in various respects by the General Assembly as it made its way through the Legislature.  An amendment initially proposed by the House, and ultimately adopted by the Conference Committee and approved by both houses of the Legislature, dealt with the potential fiscal consequences of two then-recent decisions of this Court.  One of those decisions was this Court's decision in the *Wynne* case.[17]  At that

---

[16] The 2014 BRFA was introduced after the State's Bureau of Revenue Estimates reported in December 2013 that the State had experienced a relatively slow recovery from the Great Recession of 2008-9 and characterized the fiscal outlook as "precarious."  *See* Estimated Maryland Revenues for Fiscal Years ending June 30, 2014 and June 30, 2015 (December 11, 2013), available at https://perma.cc/UX7N-SJXT.

[17] The other decision was *DeWolfe v. Richmond*, 434 Md. 403 (2012) and 434 Md. 444 (2013), which established a right to counsel for criminal defendants at initial bail hearings and which would potentially increase expenditures to compensate appointed counsel.  *See* 2014 BRFA §17; Revised Fiscal and Policy Note for Senate Bill 172 (June 17, 2014) at 63-64.

Both *Wynne* and *Richmond* potentially increased the financial burden of county governments, as the *Wynne* case could require refunds of the local portion of the State income tax and the *Richmond* decision affected expenses in the District Court and circuit courts normally borne by the pertinent county.

time, it was estimated that the State owe approximately $190 million in refunds and $51 million in interest calculated under the then-current law, and that tax revenues would decrease by $43 million annually, if the *Wynne* decision were affirmed.[18] In response, Section 16 of the 2014 BRFA provided:

> That, notwithstanding any other provision of law, the Comptroller shall set the annual interest rate for an income tax refund that is the result of the final decision under Maryland State Comptroller of the Treasury v. Brian Wynne, et ux. 431 Md. 147 (2013) at a percentage, rounded to the nearest whole number, that is the percent that equals the average prime rate of interest quoted by commercial banks to large businesses during fiscal year 2015, based on a determination by the Board of Governors of the Federal Reserve Bank.

2014 BRFA §16.[19] It was estimated that this provision would save an estimated $38.4 million in interest expenditures with respect to potential refunds that would otherwise reduce revenue passed on to local governments.[20]

This section of the 2014 BRFA thus reduced State and local expenditures by limiting the interest to be paid on a refund occasioned by the *Wynne* case to the prime rate – a rate

---

[18] Revised Fiscal and Policy Note for Senate Bill 172 (June 17, 2014) at 67; Bill Review Letter for Senate Bill 172 (May 14, 2014) at 10; *see also* Revised Fiscal and Policy Note for House Bill 72 (June 19, 2015) at 71.

[19] This annual interest rate was made applicable to income tax refunds based on the *Wynne* decision attributable to tax years from 2006 through 2014. 2014 BRFA §20. As indicated in the text, the General Assembly later provided in separate legislation for a graduated reduction in the interest rates generally pertaining to tax refunds. Chapter 322, §1, Laws of Maryland 2016.

[20] Revised Fiscal and Policy Note for Senate Bill 172 (June 17, 2014) at 67.

of interest banks charge for creditworthy borrowers[21] – instead of the minimum 13% rate that the law otherwise provided in the tax code at that time.

>    2.    2015 BRFA

During its next session, while the *Wynne* case remained pending in the Supreme Court, the General Assembly again addressed the prospective Supreme Court decision in the 2015 BRFA. Chapter 489, Laws of Maryland 2015 ("2015 BRFA").[22] In anticipation that the Supreme Court might affirm this Court's decision, the Legislature amended the income tax law to provide a credit against the county income tax for income taxes paid in other states on the same income. 2015 BRFA §4. The effectiveness of the new credit was made contingent on advice from the Attorney General that the decision ultimately issued by the Supreme Court would invalidate the then-current practice of allowing a credit only against the state portion of the Maryland income tax. 2015 BRFA §§4, 26. The legislation also set forth a mechanism for the Comptroller to pay refunds and ultimately pass the cost on to the counties that were the beneficiaries of the county income tax. *Id.*, §27.

A little more than a month after the General Assembly adjourned in 2015, the Supreme Court issued its decision affirming the judgment of this Court.

---

[21] "Prime rate" is "the interest rate that a commercial bank holds out as its lowest rate for a short-term loan to its most creditworthy borrowers." *Interest rate*, Black's Law Dictionary (11th ed. 2019).

[22] Like the 2014 BRFA, the 2015 BRFA also addressed the fiscal impact of this Court's decision in the *Richmond* case. *See* 2015 BRFA §20; Revised Fiscal and Policy Note for House Bill 72 (June 19, 2015) at 69.

# The Sequel

## A.    *The Comptroller Issues Refunds*

Following the Supreme Court decision, the Comptroller issued tax refunds to affected taxpayers and, in accordance with the direction of the General Assembly in the 2014 BRFA, included interest computed at an annual rate of 3%.  The parties agree that, assuming the retroactive application of the credit for the county portion of the state income tax enacted in the 2015 BRFA, the Wynnes overpaid their 2006 Maryland income tax by $28,789 (including interest and penalties).  The Wynnes received $33,084, including a refund of the overpayment and $4,295.52 in interest at an annual rate of 3%.  If the interest portion of the payment had been calculated at an annual rate of 13%, the Wynnes would have received more than $14,000 in additional interest.

## B.    *The Wynnes Dispute the Rate of Interest*

The Wynnes objected to the payment of interest on their refund at the 3% rate, as specified by 2014 BRFA §16, and pursued an administrative appeal.  The Comptroller issued a final determination in March 2016 rejecting their appeal.  The Wynnes then sought relief in the Maryland Tax Court.  In a three-paragraph order issued in May 2018, the Tax Court stated that it was following "the exact same logic" as the Supreme Court in the Wynnes' earlier appeal and, without further elaborating its reasoning, concluded that 2014 BRFA §16 was unconstitutional and reversed the Comptroller's decision.  The Tax Court did not address other constitutional arguments made by the Wynnes in their appeal – *i.e.*, that 2014 BRFA §16 was a retroactive law that violated the Due Process Clause, that §16

effected an unlawful taking in violation of the Fifth and Fourteenth Amendments, or that it deprived them of an accrued right in violation of Article 24 of the Maryland Declaration of Rights.

The Comptroller sought judicial review of the Tax Court order in the Circuit Court for Anne Arundel County. On December 21, 2018, the Circuit Court issued an 11-page opinion in which it analyzed the application of the dormant Commerce Clause and concluded that 2014 BRFA §16 did not violate that provision. Accordingly, the Circuit Court reversed the decision of the Tax Court and remanded the matter for further proceedings. The Circuit Court specifically noted that it was not reaching the other constitutional arguments made by the Wynnes.

The Wynnes filed a timely notice of appeal. Prior to briefing and argument in the Court of Special Appeals, the Wynnes filed a petition for a writ of *certiorari* with this Court, which we granted.

## IV

## Discussion

### A.    *Standard of Review*

Like the previous iteration of the controversy between the Wynnes and the Comptroller concerning their 2006 income tax return, this case involves judicial review of an administrative agency decision – *i.e.*, a decision of the Maryland Tax Court – in light of the dormant Commerce Clause of the federal Constitution. For the reasons set forth in our prior decision, we "look through" the decision of the Circuit Court to directly review the agency decision and do not defer to the agency's views on a question of constitutional law.

16

*See Wynne*, 431 Md. at 160-61. In any event, there was no explication of the constitutional issue in the Tax Court order to which we could defer.

**B.      *Whether 2014 BRFA §16 Violates the Dormant Commerce Clause***

We begin where we ended the last episode of this saga. In analyzing the application of the dormant Commerce Clause to the county portion of the Maryland income tax, both this Court and the Supreme Court applied what is known as the "internal consistency test" to assess state tax schemes under the dormant Commerce Clause. Both decisions used hypothetical examples to illustrate the operation of the existing Maryland tax credit and how it disfavored Maryland residents who had income that was earned and taxed out-of-state. Each majority opinion compared a hypothetical Maryland taxpayer who earned all or part of his income from interstate activities (Bob in the Supreme Court's opinion, John in this Court's opinion) with a hypothetical Maryland taxpayer who earned all of her income from intrastate activities (April in the Supreme Court's opinion, Mary in this Court's opinion).[23] In those examples, the taxpayers who had income from interstate commerce (Bob and John) paid significantly more total tax than their counterparts whose income derived solely from activities in Maryland (April and Mary). This comparison supported the conclusion that the existing Maryland tax scheme violated the dormant Commerce Clause.

---

[23] *See* 431 Md. at 167-69; 135 S.Ct. at 1803-5. The Wynnes relied on similar hypotheticals in their briefs, both in this Court and in the Supreme Court. *See* 2014 WL 4681795 at pp. 22-23.

The State has now compensated taxpayers like Bob and John by providing refunds with interest at the prime rate. Given that interest calculated at the prime rate exceeded the rate of inflation,[24] hypothetical taxpayers Bob and John have received a sum that exceeds the present value of the extra taxes they paid in 2006 and have been made whole compared to April and Mary, who earned income solely from intrastate activities and paid less tax in 2006.

Placed in the context of the hypotheticals on which they relied in the prior litigation, the Wynnes essentially argue that the dormant Commerce Clause also requires that Bob and John should have received even more favorable treatment than April and Mary in the form of a 13% annual interest rate on their refunds.[25] In our view, the dormant Commerce Clause does not require such a windfall for the Wynnes or their hypothetical counterparts.

1.    The State action at issue

The provision at issue in this case – 2014 BRFA §16 – is part of the remedy provided by the General Assembly for the constitutional violation found by this Court and confirmed by the Supreme Court in the prior litigation. The Due Process Clause requires the State to provide a "clear and certain remedy" for a violation of the dormant Commerce Clause,

---

[24] The interest received by the Wynnes amounted to a cumulative 14.92% of their refund ($4,295.52 ÷ $28,789). As measured by the Bureau of Labor Statistics, the cumulative rate of inflation during the same period was approximately 10%. *See* https://www.usinflationcalculator.com/.

[25] According to the figures in the parties' stipulation, if a 13% annual rate were applied, the cumulative rate of interest on the Wynnes' refund would be approximately 65% ($18,679.70 ÷ $28,789).

18

although not necessarily in the form of a refund. *McKesson Corp. v. Division of Alcoholic Beverages*, 496 U.S. 18, 32-39 (1990). That remedy may take different forms, which may involve a full refund or partial refund, "so long as the resultant tax actually assessed during the contested tax period reflects a scheme that does not discriminate against interstate commerce." *Id.* at 41. Moreover, when a state chooses to provide a refund for that purpose, the state may take into account its "legitimate interest in sound fiscal planning" by limiting that refund in various ways. *Id.* at 45, 50-51; *see also Fulton Corp. v. Faulkner*, 516 U.S. 325, 346-47 (1996).[26]

The remedy adopted by the General Assembly involved a retroactive extension of the tax credit for the benefit of the Wynnes and similarly-situated taxpayers, resulting in the payment of refunds that would carry interest at approximately the prime rate. The basis of the Wynnes' claim in this appeal is that, had the General Assembly simply authorized the refunds as the remedy for the constitutional violation without specifying a rate of interest on those refunds, the minimum 13% interest rate in TG §13-604(b) would have applied to their refund. It is the specification of a different interest rate pegged to the prime rate as part of this remedy that, in the Wynnes' view, resulted in another violation of the dormant Commerce Clause.

---

[26] In discussing how a refund of a tax payment could satisfy a state's obligation to provide a "clear and certain" remedy, the Supreme Court in *McKesson* did not suggest that interest was a required element of such a refund and indicated that a state could place various constraints on any refunds, such as limiting them only to taxpayers who paid the tax under protest or by enforcing a relatively short period of limitations for claiming a refund. 496 U.S. at 50. At oral argument, the Wynnes' counsel agreed that the refunds authorized by the 2014 and 2015 BRFAs satisfied the requirements of *McKesson*.

2.    Application of the dormant Commerce Clause

As explained above, the courts developed the doctrine of the dormant Commerce Clause as, in a sense, the flip side of the federal Constitution's affirmative grant of power to Congress to regulate interstate commerce. *Hughes v. Oklahoma*, 441 U.S. 322, 326 n.2 (1979) ("The definition of 'commerce' is the same when relied on to strike down or restrict state legislation as when relied on to support some exertion of federal control or regulation."). It follows then that, when a state law is challenged as violative of the dormant Commerce Clause, one must first assess whether it regulates interstate commerce in some way, or purports to do so. If the answer is "no," then the dormant Commerce Clause presumably does not reach that law. Thus, a threshold question is whether the law implicates interstate commerce. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 572-75 (1997) (analyzing first whether state tax treatment of a non-profit summer camp implicates interstate commerce); *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 389-90 (1994) (analyzing first whether a municipal solid waste flow control ordinance regulates interstate commerce).

If it appears that the law affects interstate commerce, the next question is whether the law *discriminates* against interstate commerce[27] – an issue on which the party

---

[27] In many cases, particularly when the relationship of the challenged law to interstate commerce is evident, courts proceed directly to the question whether the law discriminates against interstate commerce. *See, e.g.*, *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192-94 (1994); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 268-69 (1984).

challenging the constitutionality of the law bears the burden. *Hughes*, 441 U.S. at 336. A

law may discriminate against interstate commerce on its face or in its practical effect.[28]

*Wyoming v. Oklahoma*, 502 U.S. 437, 454-55 (1992); *C & A Carbone*, 511 U.S. at 402

(O'Connor, J., concurring in the judgment). In language resonant of Equal Protection

analysis, it is sometimes said that state laws that discriminate against interstate commerce

are subject to "the strictest scrutiny." *Hughes*, 441 U.S. at 337. In other words, the law

survives such scrutiny only if it "advances a legitimate local purpose that cannot be

---

[28] The courts have sometimes referred to a third category – purposeful discrimination. *See, e.g.*, *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 35-38 (1st Cir. 2005); *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 593-96 (8th Cir. 2003); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 335-36 (4th Cir. 2001). However, it is difficult to conceive of a truly separate category of "purposeful discrimination" that does not also fit within the categories of either facial discrimination or discrimination in effect – that is, it is difficult to imagine a case in which a state legislature intended to discriminate against interstate commerce but did not make that purpose clear in the statute (and thereby did not facially discriminate) and also failed to achieve that purpose (and thereby did not discriminate in effect). A review of dormant Commerce Clause cases that have considered "purposeful discrimination" concluded that the analysis conducted in those cases has been inconsistent and that the instances in which courts have decided dormant Commerce Clause cases by finding purposeful discrimination without also finding facial discrimination or discrimination in effect are "relatively rare." Julian C. Zebot, *Awakening a Sleeping Dog: An Examination of the Confusion in Ascertaining Purposeful Discrimination against Interstate Commerce*, 86 Minn. L. Rev. 1063, 1084 (2002). Moreover, the Supreme Court, in its opinion concerning the prior litigation between the Wynnes and the Comptroller, stated that the "Commerce Clause regulates effects, not motives," which would appear to discount the notion of a separate category based on discriminatory purpose. 135 S.Ct. at 1801 n.4.

In any event, the Wynnes agree that the General Assembly's motives in this case do not matter, and have only addressed the categories of facial discrimination and discrimination in effect.

21

adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. v. Limbach*, 486 U.S. 269, 278 (1988).[29]

   3.    Whether 2014 BRFA §16 regulates interstate commerce

The Supreme Court has identified three broad categories of activity that may be regulated by Congress under the Commerce Clause: (1) use of the channels of interstate commerce, (2) instrumentalities of interstate commerce, or persons or things in interstate commerce, or (3) intrastate activities having a substantial effect on interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558-59 (1995). Accordingly, state regulation of those activities may implicate the constraints imposed by the dormant Commerce Clause.

Courts have concluded that a variety of state laws affect the channels of interstate commerce or those involved in such commerce – *e.g.*, retail alcohol license guidelines,[30]

---

[29] The case law applying the dormant Commerce Clause has also applied a lesser standard of scrutiny, including a rational basis test, when a law does not discriminate against interstate commerce, but nonetheless burdens it in some way. In such a case, the law will violate the dormant Commerce Clause only if the burden on interstate commerce "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). In assessing the benefits of a challenged law, the court conducts a rational basis review, before weighing it against the burden on interstate commerce. *Colon Health Ctrs. of Am., LLC v. Hazel*, 733 F.3d 535, 545 (4th Cir. 2013). This standard is commonly referred to as the "*Pike* balancing" test. *See, e.g.*, *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 353 (2008). The Wynnes have not argued that 2014 BRFA §16 should be assessed under the *Pike* balancing test, but rather that it should be invalidated under a strict scrutiny test as discriminatory in effect. *Cf. Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36 (1st Cir. 2007) (challenger of state wine law under dormant Commerce Clause relied only on discrimination in effect theory and did not invoke *Pike* balancing).

[30] *Tennessee Wine & Spirits Retailers Assoc. v. Thomas*, 139 S.Ct. 2449 (2019).

22

milk pricing regulations,[31] solid waste disposal ordinances,[32] apple labeling laws.[33] Favorable tax treatment for in-state entities has been found to affect interstate commerce in a number of contexts – *e.g.*, a charitable property tax exemption statute,[34] a tax credit for in-state produced ethanol fuel,[35] a state excise tax exemption for certain locally produced liquors,[36] a tax exemption for wholesaling of products produced in-state.[37]  In these cases, where a state regulation increased costs on the interstate flow of waste disposal, wines, and apples, or where a tax provision gave an advantage to intrastate production or products, the relevant interstate market was readily obvious and interstate commerce clearly implicated.

This appeal concerns not an industry regulation or a tax, but the rate of interest paid on a tax refund provided as a remedy for a past constitutional violation.  The Wynnes contend that there is no distinction to be made between the rate of interest on a tax refund and the underlying tax itself because, as they see it, "[t]he dormant Commerce Clause applies to all government action," although they later qualify that assertion by conceding

---

[31] *West Lynn Creamery*, 512 U.S. at 194-97.

[32] *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 99 (1994).

[33] *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977).

[34] *Camps Newfound/Owatonna,* 520 U.S. at 573-74.

[35] *Limbach*, 486 U.S. at 274.

[36] *Bacchus Imports,* 468 U.S. at 269.

[37] *Armco, Inc. v. Hardesty*, 467 U.S. 638 (1984).

that it applies only to "laws that harm interstate commerce to the benefit of intrastate commerce."

In our view, there is a fundamental difference between a tax and the rate of interest that may be paid on a tax refund.[38]  As the Supreme Court pointed out in the prior litigation between the Wynnes and the Comptroller, a tax can operate similarly to a tariff – "[t]he paradigmatic example of a law discriminating against interstate commerce."  135 S.Ct. at 1804.  A provision that prospectively affects one's anticipated tax liability can have a direct impact on interstate commerce by its "distorting effect on the geography" of production or capital investment.  *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994).  In contrast, it is considerably less likely that those involved in commercial activity consider tax refund procedures in their decision-making.  And the rate of interest, if any, that a state chooses to pay on a tax refund may be frequently adjusted in response to macroeconomic forces like the rate of inflation or other factors affecting a state's fiscal outlook.  In many instances, the rate of interest on a tax refund (if interest is paid at all) may be determined well after any business decision affecting interstate commerce that generated the previously taxed income that is the subject of the refund.[39]  In short, the rate of interest paid on tax

---

[38] To be sure, a tax refund and any interest paid on that refund are clearly related. Whatever interest rate may apply, the amount of any interest is based on the amount of the refund and the administrative procedures for challenging the amount of interest are the same as the procedures for challenging the amount of the underlying refund.  *See Comptroller v. Science Applications Intern. Corp.*, 405 Md. 185 (2008).  However, this does not mean that the interest rate on a refund presents the same question as the imposition of the tax for purposes of dormant Commerce Clause.

[39] In response to the observation that business decisions would generally pre-date the determination and timing of a tax refund, the Wynnes imagine a retroactive state tax

24

refunds is too attenuated from interstate commerce as to substantially affect or interfere with the decision-making that directs the flow of capital or the location of transactions.

Accordingly, in our view, the interest rate established for tax refunds is not the sort of state action that implicates interstate commerce sufficiently to awaken the dormant Commerce Clause. Nonetheless, we will also evaluate the Wynnes' contention that 2014 BRFA §16 discriminates against interstate commerce.

4. Whether 2014 BRFA §16 discriminates against interstate commerce

As noted above, the Wynnes bear the burden of showing that 2014 BRFA §16 impermissibly discriminates against interstate commerce, either facially or in practical effect.

At first glance, the Wynnes appear to have taken disparate positions in their briefing to this Court on whether 2014 BRFA §16 is facially discriminatory.[40] In the end, they focus their argument on whether the provision is discriminatory in its practical effect. This appears to be an appropriate decision in light of the case law concerning facial

_____

that discriminates against interstate commerce and argue that such a tax would be unconstitutional, not only under the Due Process clause and other constitutional provisions, but also under the dormant Commerce Clause. Whatever merit that argument may have as a matter of academic discussion, it is not this case, which involves a remedy authorized by the General Assembly.

[40] *Compare* Brief of Appellants at 9 (heading entitled "Section 16 Discriminates on its Face against Interstate Commerce") *with* Reply Brief of Appellants at 11 ("[W]e have never contended that Section 16 is *facially* discriminatory; we have instead explained that Section 16 is discriminatory *in effect*.") (emphasis in original).

25

discrimination.[41]   Accordingly, we will likewise focus our discussion on whether the provision discriminates against interstate commerce in its effect.

A fundamental principle under the dormant Commerce Clause is that "any notion of discrimination assumes a comparison of substantially similar entities." *Dep't of Revenue v. Davis*, 553 U.S. 328, 342 (2008).  In this regard, it is important to remember that the focus of the dormant Commerce Clause is on "markets and participants in markets." *General Motors Corp. v. Tracy*, 519 U.S. 278, 300 (1997).  There must be actual or prospective competition between entities in an identifiable market and state action that places an undue burden on interstate commerce.  *Id*.

For example, in a case involving a state apple labeling law, the Supreme Court found that the law discriminated in effect in violation of the dormant Commerce Clause only after

---

[41] Cases applying the dormant Commerce Clause in which facial discrimination has been found generally involve explicit geographic references.  *See, e.g.*, *Camps Newfound/Owatonna,* 520 U.S. at 572-77 (tax exemption statute expressly differentiated between institutions that served in-state residents and those "operated principally for the benefit of" out-of-state residents); *Chemical Waste Mgmnt. v. Hunt*, 504 U.S. 334, 336-37 (1992) (state law imposed additional disposal fee for hazardous waste imported from outside the state); *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 340-41 (1989) (state law required interstate brewers or shippers of beer, but not intrastate brewers or shippers, to comply with certain price regulations); *Limbach*, 486 U.S. at 274 (tax credit against state fuel tax related to portion of gasohol comprised of ethanol produced within the state, but not within other states without a reciprocal credit).

Here, as part of the remedy for the constitutional violation found in the earlier litigation between the Wynnes and the Comptroller, 2014 BRFA §16 set an annual interest rate for a refund paid to a taxpayer as a result of that court decision without expressly making any geographic distinctions.  Whether that interest rate had the effect of discriminating against interstate commerce is a different question, discussed in greater detail in the text of this opinion.

26

it conducted an exhaustive review of the record documenting the law's deleterious effect on the interstate market for apples. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333 (1977). Even when a party challenging a state law is able to identify a pertinent market, courts have declined to find a violation of the dormant Commerce Clause unless the challenger is able to demonstrate how the law discriminates in practical effect against interstate commerce or out-of-state economic actors. *See, e.g.*, *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1100 (9th Cir. 2013) (parties challenging state fuel standard law failed to satisfy the "particularly high" burden of showing that law had a discriminatory effect against out-of-state crude oil); *Black Star Farms LLC v. Oliver*, 600 F.3d 1225, 1232-34 (9th Cir. 2010) (summary judgment appropriate when challenger of state wine distribution law offered only speculation that law "might" discriminate against interstate commerce); *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1040-41 (10th Cir. 2009) (out-of-state attorney challenging Utah law concerning nonjudicial foreclosures failed to show how the law altered the competitive balance between resident and non-resident attorneys); *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36 (1st Cir. 2007) (stipulated record did not establish that state law relating to wine sales "alters the competitive balance between in-state and out-of-state firms"); *R & M Oil & Supply, Inc. v. Saunders*, 307 F.3d 731, 734-35 (8th Cir. 2002) (state law regulating storage of propane did not discriminate against interstate commerce in effect as stipulated record did not establish that, "as a practical matter," the law placed out-of-state propane distributors at a competitive disadvantage); *Eastern Ky. Res. v. Fiscal Court of Magoffin Co.*, 127 F.3d 532, 544 (6th Cir. 1997) (state law regulating waste disposal did not discriminate in effect as challengers failed to show

27

"how local economic actors are favored at the expense of out-of-state economic actors"); *Nat'l Paint & Coating Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995) (challenger of municipal ordinance generally prohibiting sale of spray paint failed to demonstrate how ordinance would favor paint sales by in-state firms over those by out-of-state firms).

In the prior litigation between the Wynnes and the Comptroller concerning the Maryland tax credit scheme, we concluded that it affected the "market for capital and business investment." *Wynne*, 431 Md. at 164-65. Here, 2014 BRFA §16 affected the interest to be paid on any tax refunds authorized if the Supreme Court were to affirm this Court's decision in the prior litigation between the Wynnes and the Comptroller. A year later, the Supreme Court did so and the Comptroller applied §16 to the refunds that were authorized by the General Assembly.

It is evident that the General Assembly adopted 2014 BRFA §16 in light of the estimated $200 million in expenditures for thousands of refunds that could be required by an adverse Supreme Court decision in the *Wynne* case, a budget hit that would be exacerbated if a minimum 13% interest rate were applied to that sum – all of which would hinder the State's already slow recovery from the Great Recession. This was consistent with the constitutional responsibility of the Governor and the General Assembly to maintain a balanced budget. Pegging an interest rate to be paid on those refunds to one commonly used by banks (and that ultimately exceeded the rate of inflation) ensured fair compensation of those taxpayers while maintaining the fiscal integrity of the State. The Wynnes suggest that the General Assembly could have adopted alternative measures to

28

deal with the State's fiscal situation and still allowed them to reap a 13% return on their refund. However, that does not mean that the General Assembly's chosen method for providing a remedy had the effect of disadvantaging out-of-state economic interests.

The Wynnes have not pointed to any evidence, or other indication, that the interest rate set by 2014 BRFA §16 would alter the competitive balance for interstate investment – or any other interstate industry, for that matter. Rather, they argue §16 discriminates in effect against interstate commerce because (1) it provided "*Wynne* claimants" with a "special, lower interest rate that no taxpayer engaged in intrastate commerce receives" and (2) the "defining feature" of *Wynne* claimants is that they engaged in interstate commerce. As a result, they conclude, §16 "sends a message" that Maryland will disadvantage taxpayers involved in interstate commerce and thereby discourages out-of-state investment by Maryland taxpayers – although they concede that the disincentive they perceive is "relatively small."

With respect to the first premise, the Wynnes mistakenly contend that they "receive far less interest on their refunds than other taxpayers." This argument ignores the fact that most taxpayers, including those whose livelihoods involve activities affecting interstate commerce, receive no interest at all on a tax refund. Refunds owed to taxpayers other than those occasioned by our decision in *Wynne* may or may not be accompanied by interest at a different rate – or no interest at all. The Wynnes have not demonstrated, and §16 does not entail, that taxpayers "engaged in intrastate commerce" necessarily receive interest on a tax refund at a rate greater than that applied to the Wynnes' refund. What apparently is the case is that the total amount of the refunds occasioned by the *Wynne* decision were

29

likely to be substantial and that the Legislature needed to take account of that unanticipated expense in the BRFA as it endeavored to satisfy the constitutional mandate for a balanced budget.[42]  (As noted earlier, *Wynne* was not the only court decision that threatened the balanced budget and required special attention in the BRFA).

The Wynnes argue generally that whether the State pays interest on tax refunds and how it sets the rate of interest paid to a particular category of refunds may lead to "skewed incentives for market participants" and will disincentivize them from conducting "income-generating activities in other states with income taxes."  They do not indicate what market participants would be affected other than to vaguely refer to the "tax refund anticipation loan industry."[43]  The Wynnes do not explain how that industry, which makes very short-term loans secured by tax refunds that typically are not eligible for interest, would be affected by 2014 BRFA §16.[44]  This perhaps illustrates the apparent difficulty that the

---

[42] The Wynnes argue that the General Assembly might have reduced State expenditures more for the relevant fiscal years by paying 3% on all tax refunds – but presumably mean to refer only to that subset of tax refunds for which the General Assembly has authorized the payment of interest.

[43] They also cite an academic article that discusses whether a new insurance product called "tax risk insurance," which insures against the risk of an audit and tax assessment, is beneficial or may encourage abusive tax avoidance schemes and tax evasion.  *See* Kyle D. Logue, *Tax Law Uncertainty and the Role of Tax Insurance*, 25 Va. Tax Rev. 339 (2005).  The article does not address tax refunds or the interest that may be paid on refunds.

[44] Refund anticipation loans are usually short-term, high-cost loans secured by a taxpayer's expected refund (valued at a discount) and are generally marketed to lower-income, cash-strapped customers seeking money in a hurry.  *See Green v. H & R Block*, 355 Md. 488, 495-501 (1999); Leslie Book, *Refund Anticipation Loans and the Tax Gap*, 20 Stan. L. & Policy Rev. 85 (2009); National Consumer Law Center, *Refund Anticipation Loans and Checks*, https://perma.cc/EJ3Q-27TM.  Under a State consumer protection law, promoters of such loans are subject to various disclosure and practice requirements.  *See*

30

Wynnes have in making a hypothetical comparison to an advantaged person with solely intrastate activities – someone equivalent to "Mary" or "April" in the prior iteration of their dispute with the Comptroller.

With respect to the second premise, it is certainly true that the tax refund received by the Wynnes, and presumably those received by many other "*Wynne* claimants," related to taxes paid as a result of income derived from business activities in other states. Nevertheless, as the Circuit Court noted, in some instances Maryland taxpayers who pay income tax to another state based on income generated in that state are not engaged in business activities in other states – for example, a holder of a winning out-of-state lottery ticket or a Maryland resident who happens to own real property in another state and sells it. Such a taxpayer would also receive a refund under the 2015 BRFA, based on a retroactive allowance of a credit against the county portion of the Maryland income tax, with interest at the rate set by 2014 BRFA §16.

The Wynnes contend that both of the examples cited by the Circuit Court fall within the "market for capital and business investment" and therefore "substantially affect"

---

Maryland Code, Commercial Law Article ("CL"), §14-3801 *et seq.* Because such loans typically last less than two weeks and interest is payable on tax refunds only after 45 days, the tax refunds securing such loans typically would not be eligible for interest. *See* CL §§14-3803(b)(3), 14-3804(a)(5), 14-3805(a)(1); TG §13-603(a).

In any event, there does not appear to be any suggestion that the Wynnes sought or received a refund anticipation loan in connection with their refund based on a tax credit for part of the tax on their pass-through Subchapter S corporation income.

31

interstate commerce.[45] This would seem to stretch the concept of something that substantially affects interstate commerce to encompass any transaction that involves a Maryland resident receiving or paying money in another state – which would also result in an expansive view of Congress' coincident authority to regulate such activities under the Commerce Clause.

Even if we were to accept this premise, and even if all or most of the taxpayers entitled to refunds as a result of the *Wynne* decision and the General Assembly's actions in the two BRFAs derived the pertinent income from interstate commerce, that alone does not mean that the law discriminates against interstate commerce. *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125-29 (1978) (the fact that a state law affected only out-of-state entities does not by itself establish that the law discriminated against interstate commerce as that law did not disadvantage those entities in comparison to in-state competitors). Rather, it reflects the remedial nature of the 2014 and 2015 BRFA provisions.

---

[45] Alternatively, the Wynnes argue that, in effect, the Comptroller has been too generous in his application of 2014 BRFA §16 in providing refunds under that provision to taxpayers not involved in interstate commerce. In their view, §16, and presumably also the 2015 BRFA provisions authorizing refunds, should be construed narrowly not to apply to all taxpayers but *only* to taxpayers, like the Wynnes, whose refunds relate to business activities in other states. While such a construction may advance the Wynnes' attack on the constitutionality of §16 premised on the idea that it affects only refunds related to interstate commerce, it is contrary to one of the standard canons of statutory construction. *See Harrison-Solomon v. State*, 442 Md. 254, 287 (2014) (statutes to be construed to avoid conflict with Constitution).

## C.    *Summary*

As noted earlier, the Wynnes no longer rely on the comparison of Bob and April and John and Mary.  They evidently found it difficult, as do we, to hypothesize a counterpart taxpayer engaged in solely intrastate activities who prevails in a constitutional challenge to the State tax code that results in a refund to the taxpayer and others, as well as a sizeable hit to the State budget, who would receive a better remedy from the General Assembly.  Certainly, nothing in §16 would require that result.  They are unable to point to a way in which the remedy that they received for the earlier constitutional violation and that satisfied the standard set by *McKesson* somehow itself disadvantages interstate commerce or advances the economic protectionism that the dormant Commerce Clause is thought to thwart.  They have not borne the burden of showing discrimination in effect.

## V

## Conclusion

For the reasons set forth above, we hold that 2014 BRFA §16 does not violate the dormant Commerce Clause of the federal Constitution.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY PETITIONERS.

33