*Jonathan A. Maizel & Beatriz E. Maizel v. Comptroller of the Treasury*
Case No. 508, September Term, 2018


**MARYLAND INCOME TAX – CLAIM FOR REFUND OF OVERPAYMENT – STATUTE OF LIMITATION.** A person who seeks to pursue a claim for a refund of overpayment of Maryland income taxes is generally subject to the time limit imposed by Maryland Code (1988, 2016 Repl. Vol.), Tax – General Article ("TG"), § 13-1104(c)(1), which requires that the claim be filed no later than three years from the time the pertinent tax return was filed or two years after the date the overpayment of tax was paid, whichever of such periods expires the later. The possible extension provided by TG § 13-1104(j) is an exception that is applicable only to a taxpayer who was a party to an administrative proceeding as described in that subsection.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 508

September Term, 2018

_____

JONATHAN A. MAIZEL, ET UX.

v.

COMPTROLLER OF THE TREASURY

_____

Meredith,*
Graeff,
Reed,

JJ.

_____

Opinion by Meredith, J.

_____

Filed:  April 29, 2021

*Meredith, Timothy E., J., now retired, participated in the hearing of this case while an active member of this Court, and after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the preparation of this opinion.

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Jonathan Maizel and Beatrize Maizel, appellants, have appealed from a judgment of the Circuit Court for Montgomery County which, upon judicial review of a ruling of the Maryland administrative agency known as the Maryland Tax Court, affirmed the denial of the Maizels' application for income tax refunds, which was the position urged by the Maryland Comptroller of the Treasury, appellee.

The Maizels had filed amended income tax returns seeking refunds because, they asserted, they had overpaid Maryland income taxes for the calendar years 2006 through 2011. At the time the Maizels filed their original returns for those years, the deduction that Maryland allowed for income taxes they had paid in other states where they owed income tax was structured in a manner that was later recognized as being in violation of the dormant Commerce Clause of the United States Constitution. After the Maizels filed their original returns for 2006 through 2011, a challenge to the Maryland tax provision was successfully raised by taxpayers named Brian and Karen Wynne. *See Maryland State Comptroller of Treasury v. Wynne*, 431 Md. 147 (2013), *aff'd*, 575 U.S. 542 (2015) (hereinafter "*Wynne I*"), and *Wynne v. Comptroller of Maryland*, 469 Md. 62 (2020) (hereinafter "*Wynne II*"). In *Wynne II*, 469 Md. at 67, the Court of Appeals summarized the *Wynne I* litigation very briefly as follows:

> The litigation began when the Wynnes challenged an aspect of the Maryland income tax law – in particular, the credit allowed by State law against a Maryland resident's income tax liability based on taxes the resident paid to other states on income derived from those states. The Wynnes argued that the Maryland tax scheme discriminated against interstate commerce and thus violated what is known as the dormant Commerce Clause of the federal Constitution. Both this Court and the Supreme Court, in closely divided decisions, agreed with that argument.

Beginning in October 2013, the Maizels attempted to take advantage of the Wynnes' success by seeking refunds for the portion of the taxes that the Maryland Court of Appeals had declared unconstitutional in *Wynne I*. But, because more than three years had elapsed between the time the Maizels paid their taxes (without receiving full credit for taxes paid to other states) and the date the Maizels filed amended returns seeking to take advantage of the *Wynne I* ruling, the Comptroller denied the refunds because the Maizels' claims were filed after the three-year statute of limitations prescribed by Maryland Code (1988, 2016 Repl. Vol.), Tax – General Article ("TG"), § 13-1104(c)(1). That statute provides that, subject to exceptions that are not pertinent here, "a claim for refund or credit of overpayment of . . . income tax may not be filed after the periods of limitations for filing claims for refund or credit of overpayment set forth in [26 U.S.C.] § 6511 of the Internal Revenue Code," which requires such claims to be filed "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later."

Although all of the Maizels' amended returns seeking refunds were filed beyond the time limit prescribed by TG § 13-1104(c)(1), the Maizels argued that their refund claims should nevertheless be considered timely pursuant to the exception provided in TG § 13-1104(j), which states:

> Notwithstanding subsection (c) of this section, a claim for refund or credit for overpayment of income tax attributable to a right to a reduction in a person's Maryland income tax that is established by a decision of an administrative board or by an appeal of a decision of an administrative board may be filed within 1 year after the date of a final decision of the administrative board or a final decision of the highest court to which an appeal of a final decision of the administrative board is taken.

2

The Maizels took the position that they were entitled to file claims for refunds of all taxes they had overpaid (because of not receiving full credit for the taxes they had paid to other states) at any point in the past so long as they filed those claims for refunds within one year after the date the Supreme Court issued its decision in *Wynne I* on May 18, 2015.

After the Comptroller rejected the Maizels' argument that, without regard to the normal statute of limitations, they were entitled to file their refund claims within one year after the Supreme Court's decision in *Wynne I*, the Maizels appealed to the Maryland Tax Court, which heard the matter *de novo* and concluded that, because the Maizels were not parties in *Wynne I*, they were not entitled to the extra one-year provided by TG § 13-1104(j).

The Maizels filed a petition for judicial review in the Circuit Court for Montgomery County. After that court affirmed the ruling of the Tax Court, the Maizels filed this appeal, in which they have raised the following questions for our review:

1. Did the Tax Court err in concluding that § 13-1104(j) does not apply to appellants' amended Maryland income tax returns seeking *Wynne* refunds for the relevant years?

2. Does denial of appellants' *Wynne* refunds for the relevant years violate appellants' rights to due process under the 14th Amendment and/or the Maryland Constitution?

3. Did the Tax Court abuse its discretion or otherwise commit reversible error in allowing appellee's assertion of privilege in respect of certain documents sought by appellants in discovery?

Because we conclude that the Tax Court correctly ruled that the extra time for filing a refund claim pursuant to TG § 13-1104(j) is available only to the parties to the

3

administrative proceeding described in that section, we shall affirm the Tax Court's ruling denying the Maizels' claims for refunds.

## FACTS AND PROCEDURAL HISTORY

During the relevant period of 2006 through 2011, the Maizels resided in Montgomery County, Maryland. Mr. Maizel was a partner in a law firm that had offices in New York and California, and he paid income taxes in those states as well as in Maryland.

The Court of Appeals explained in *Wynne I*, 431 Md. at 154, that a 1975 amendment to Maryland tax law limited the credit against income tax liability that could be claimed by Maryland residents who earned taxable income that was also subject to taxation in other states, noting: "The Maryland income tax law reaches all of the income of a Maryland resident. The State income tax law allows a credit against an individual's State tax liability for income taxes paid to other states based on the income earned in those states." But, the Court explained in *Wynne I*, after the General Assembly amended Maryland's tax law in 1975, the credit was no longer allowed to be claimed against Maryland's "county" income tax for income taxes Maryland residents had paid to other states. *Id*. at 157 (citing TG § 10-703(a); *Comptroller v. Blanton*, 390 Md. 528 (2006)).

When the Wynnes claimed the full credit on their 2006 tax return against all Maryland income tax, including the county portion, the Comptroller assessed them for a deficiency in the amount of Maryland taxes paid. *Id*. at 159. The Wynnes appealed to the Maryland Tax Court and argued "that the limitation of the credit to the State tax for tax payments made to other states discriminated against interstate commerce in violation

4

of the Commerce Clause of the United States Constitution." *Id* at 160. The Tax Court rejected the Wynnes' argument, but, upon judicial review, the Circuit Court for Howard County reversed the Tax Court and ruled that the tax scheme was in violation of the dormant Commerce Clause. *Id.*

The Court of Appeals granted the Comptroller's petition for certiorari and affirmed the circuit court's ruling, holding in *Wynne I* that "the failure of the Maryland income tax law to allow a credit against the county tax for a Maryland resident taxpayer with respect to pass-through income of an S corporation that arises from activities in another state and that is taxed in that state violates the dormant Commerce Clause of the federal Constitution." *Wynne I*, 431 Md. at 176-77 (footnote omitted). The Court emphasized:

> [T]he county income tax itself is not unconstitutional. Nor is the credit, which serves to ensure that the Maryland income tax scheme operates within constitutional constraints. Nor is the Maryland income tax law generally. What is unconstitutional is the application—or lack thereof—of the credit to the county income tax [for residents who paid income taxes to other states].

*Id.* at 177-78. The case was remanded to the Tax Court for recalculation of the Wynnes' tax liability.

The opinion of the Court of Appeals in *Wynne I* was filed on January 28, 2013, and refiled May 17, 2013, with minor revisions made in response to a motion for reconsideration. The United States Supreme Court granted certiorari on May 27, 2014, 572 U.S. 1134 (2014), and affirmed the ruling of the Maryland Court of Appeals on May 18, 2015, 575 U.S. 542 (2015). The majority opinion of the Supreme Court observed:

5

This case involves the constitutionality of an unusual feature of Maryland's personal income tax scheme. Like many other States, Maryland taxes the income its residents earn both within and outside the State, as well as the income that nonresidents earn from sources within Maryland. But unlike most other States, Maryland does not offer its residents a full credit against the income taxes that they pay to other States. The effect of this scheme is that some of the income earned by Maryland residents outside the State is taxed twice. Maryland's scheme creates an incentive for taxpayers to opt for intrastate rather than interstate economic activity.

575 U.S. at 545. The Supreme Court held that this discriminatory treatment (*i.e.*, the less favorable tax treatment) of income earned by residents as a consequence of interstate commerce was a violation of the dormant Commerce Clause. *Id*.

The Court of Appeals observed in *Wynne II*, 469 Md. at 75:

Both this Court and the Supreme Court held [in *Wynne I*] that extension of the tax credit to the county portion of the income tax would cure the constitutional defect, but both decisions also acknowledged that there might be other ways of adjusting the State income tax law that would avoid the sort of discrimination against interstate commerce forbidden by the dormant Commerce Clause. 431 Md. at 189, 64 A.3d 453; [575 U.S. at 568,] 135 S. Ct. at 1806.

The General Assembly opted to amend the Maryland tax law "to allow a tax credit against the county portion, as well as the state portion, of the Maryland income tax for income taxes paid in other states." *Wynne II*, 469 Md. at 75 and 78.

Sometime in 2013, after the Court of Appeals decided *Wynne I*, 431 Md. 147, the Maizels' accountant advised them that they should file amended returns to seek refunds for the taxes they had paid to cover the county portion of Maryland income taxes as to which they did not claim or receive credit for income taxes paid to New York and

6

California.  The timeliness of the amended returns the Maizels filed in an effort to obtain such refunds is at issue in this appeal.

For the years that are the subject of this appeal, the Maizels filed their original tax returns and amended returns on the following dates:

| TAX YEAR | DATE ORIGINAL RETURN FILED | SIGNATURE DATE ON THE AMENDED RETURN | DATE AMENDED RETURN RECEIVED BY COMPTROLLER |
|---|---|---|---|
| 2006 | June 11, 2007 | February 26, 2016 | March 1, 2016 |
| 2007 | April 14, 2008 | February 26, 2016 | March 1, 2016 |
| 2008 | July 15, 2009 | February 26, 2016 | March 1, 2016 |
| 2009 | June 16, 2010 | October 10, 2013 | October 28, 2013 |
| 2010 | August 11, 2011 | October 15, 2014 | November 5, 2014 |
| 2011 | October 5, 2012 | October 14, 2015 | October 20, 2015 |

The Comptroller denied the Maizels' claims for these refunds as untimely pursuant to TG § 13-1104(c)(1), which, as noted above, requires that "a claim for refund or credit of overpayment of . . . income tax may not be filed after" the period of limitation in § 6511 of the Internal Revenue Code, which, in turn, requires federal claims to be filed within "3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later . . . ."  26 U.S.C. § 6511.  It is not disputed that each of the six amended returns filed by the Maizels (for the tax years 2006 through 2011) was filed after the period of limitations for claims of overpayment set forth in § 6511 of the Internal Revenue Code.

The Maizels appealed the Comptroller's decision to the Tax Court.  They asserted that the Supreme Court's decision in *Wynne I* was the "final decision of the highest court to which an appeal . . . [wa]s taken" relative to the administrative ruling that

7

"established" their right to a refund, and their deadline for filing for a refund therefore qualified for the TG § 13-1104(j) exception to the normal period of limitations regardless of whether they were parties in the *Wynne I* litigation. But the Comptroller maintained that the normal period of limitations applied, and that the possible extension pursuant to TG § 13-1104(j) applied only to the parties who were the litigants in the administrative proceeding referred to in that subsection. The Tax Court agreed with the Comptroller's position.

In its oral ruling, the Tax Court stated:

> [W]hen [TG § 13-1104(j)] says "a person's Maryland income tax," they're talking about the individual taxpayer and that taxpayer's process to get an administrative review of some fact of the taxpayer's taxes or goes to court over some part of some fact or something that affects their taxes. It's not intended for you to piggyback on someone else's appeal process. . . . [T]his case applies to the Wynnes individually, all the way through the Supreme Court, because they were the persons that were doing the appealing. For the Supreme Court to say that the statute is unconstitutional, that did not change your individual situation with respect to your refund or not. It made the statute unconstitutional. But whether or not you get a refund, you need to go look at the rest of the statutes of the state of Maryland to see how to apply for a refund and whether or not you are entitled to a refund. "J" doesn't affect you. [Section] 13-1104(j) didn't extend the time to you to file for a refund for you. It only did it for the people who did that appeal.

By order dated October 11, 2017, the Tax Court affirmed the Comptroller's denial of the Maizels' claims for tax refunds.

The Maizels sought judicial review in the Circuit Court for Montgomery County, which affirmed the decision of the Tax Court. In a written opinion, Judge Ronald B. Rubin explained:

> At common law, a taxpayer had no right to a refund of taxes erroneously collected by or paid to the State. Absent a statute authorizing a

8

refund, a taxpayer who "voluntarily" albeit erroneously or incorrectly paid a tax could not sue the collector to recover. *Apostol v. Anne Arundel County*, 288 Md. 667, 672-73 (1980). If enacted, a statutory remedy is exclusive, and the statute serves both as the remedy and a limitation on the government's liability to refund any "erroneously collected" tax. *See State v. Sharafeldin*, 382 Md. 129, 147-50 (2004); *Halle Dev., Inc. v. Anne Arundel County*, 371 Md. 312, 324-30 (2002). Tax statutes of limitation cannot be ignored or modified by the Comptroller, *see United States v. Garbutt Oil Co.*, 302 U.S. 528, 533-35 (1938), and are not subject to any "judge-made" equitable exceptions. *See United States v. Brockamp*, 519 U.S. 347, 352-54 (1997).

The [Maizels'] claims for refund are barred because each claim was filed more than three years after the original return was filed. The [Maizels] contend nonetheless that their refund claims did not ripen until the Supreme Court issued its decision in *Wynne* on May 18, 2015. They assert, therefore, that their claims fall within the exception described in § 13-1104(j). The court disagrees.

* * *

The Supreme Court's decision in *Wynne* did not make what Maryland did unconstitutional. The discriminatory tax was unconstitutional when it was enacted [in 1975]. The Supreme Court simply explained the Commerce Clause effect of Maryland's system of taxation. Nothing in the Supreme Court's decision (or, for that matter the earlier decision of the Court of Appeals) altered or created the [Maizels'] right to a refund. That right was established when they paid the unconstitutional tax. They simply waited too long to assert their claim. "A constitutional claim can become time-barred just as any other claim can." *Block v. North Dakota ex rel. Board of Univ. and School Lands*, 461 U.S. 273, 292 (1983).

The exception created by § 13-1104(j) does not aid the [Maizels] because they did not receive a final decision from an administrative board or tribunal. In other words, § 13-1104(j) applies only to the specific taxpayer who received the final adjustment report from the Comptroller, or were parties to the appellate decision reviewing that adjustment. This reading of § 13-1104(j) is confirmed by a review of its legislative history and the facts of the case that spurred its enactment. Suffice it to say that § 13-1104(j) was not enacted to aid taxpayers who do not file refund claims within the time required by § 13-1104(c), [and] do not themselves litigate the issues pertinent to their tax obligation but later simply come across a favorable appellate decision in a case prosecuted by some other taxpayer. The carefully crafted refund scheme established by § 13-1104(c) would

9

have no meaning if taxpayers, who failed to comply with it, were nonetheless allowed to bring refund claims simply because of action taken by some other taxpayer. *See United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 8-9 (2008).

Contrary to their contentions, the [Maizels] were not denied due process. The General Assembly has established a detailed refund scheme "that subjects complaining taxpayers to various requirements before they can bring suit." *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. at 11. Nothing stopped the [Maizels] from complying with § 13-1104(c). They knew all of the facts necessary to prosecute their refund claims well before the Supreme Court decided *Wynne*. No action by the State government prevented the timely filing of their refund claims. Like the taxpayers in *Wynne*, the [Maizels] could have challenged the validity of Maryland's refusal to allow a credit for the "county" portion of the state income tax when they filed their returns or paid their taxes. The[y] did not do so, and cannot now be heard to complain that some inaction by the Comptroller interfered with their rights. . . .

Similarly unavailing is the [Maizels'] contention that language in the 2015 Budget Reconciliation and Financing Act authorized refund claims independent of the pertinent provisions of the Tax General Article. The direction in Section 27 of the Act [calling] for the Attorney General to review the effect of *Wynne* simply did not dispense with otherwise applicable refund claim requirements.

Finally, the Maryland Tax Court did not plainly abuse its discretion when it denied the [Maizels'] motions to compel. *See Brown v. Daniel Realty Co.*, 409 Md. 565, 583-84 (2009). That tribunal correctly balanced the [Maizels'] asserted need for the documents against the Comptroller's privilege assertions. *Hamilton v. Verdow*, 287 Md. 544, 563-64 (1980). This court cannot say that the Maryland Tax Court got it wrong, much less that its decision was so wide of the mark that it was not a reasonable exercise of discretion. In any event, the contested rulings, even if erroneous, have no effect on the outcome in this case. Any asserted evidentiary error, therefore, is harmless.

The Maizels filed this timely appeal.

**STANDARD OF REVIEW**

In *Frey v. Comptroller of Treasury*, 422 Md. 111, 136-38 (2011), *cert. denied*, 566

U.S. 905 (2012), the Court of Appeals described the standard of review of decisions of

the Tax Court as follows:

> The Tax Court is "an adjudicatory administrative agency in the executive branch of state government." *Furnitureland S., Inc. v. Comptroller*, 364 Md. 126, 137 n.8, 771 A.2d 1061, 1068 n.8 (2001). As such, the Tax Court is subject to the same standards of judicial review as other administrative agencies. T.G. § 13-532(a)(1) ("A final order of the Tax Court is subject to judicial review as provided for contested cases in §§ 10-222 and 10-223 of the State Government Article."); *Supervisor of Assessments v. Hartge Yacht Yard, Inc.*, 379 Md. 452, 461, 842 A.2d 732, 737 (2004). Moreover, because we are reviewing the decision of an administrative agency, our review looks "through the circuit court's and intermediate appellate court's decisions . . . and evaluates the decision of the agency." *People's Counsel for Baltimore County v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007). . . . [W]e may not uphold the final decision of an administrative agency on grounds other than the findings and reasons set forth by the agency. *Evans v. Burruss*, 401 Md. 586, 593, 933 A.2d 872, 876 (2007); *Dep't of Health & Mental Hygiene v. Campbell*, 364 Md. 108, 123, 771 A.2d 1051, 1060 (2001) ("[A]n appellate court will review an adjudicatory agency decision solely on the grounds relied upon by the agency.").
>
> Although we retain the power to review administrative decisions, judicial review of these decisions is narrow. We shall not "substitute [our] judgment for the expertise of those persons who constitute the administrative agency." *People's Counsel for Baltimore County v. Loyola College in Md.*, 406 Md. 54, 66, 956 A.2d 166, 173 (2008) (internal quotation marks omitted) (quoting *United Parcel Serv., Inc. v. People's Counsel for Baltimore County*, 336 Md. 569, 576-77, 650 A.2d 226, 230 (1994)). Accordingly, we review the Tax Court's factual findings and the inferences drawn therefrom under a substantial evidence standard. *Surina*, 400 Md. at 681, 929 A.2d at 910; *Md. Aviation Admin. v. Noland*, 386 Md. 556, 571, 873 A.2d 1145, 1154 (2005) ("A reviewing court should defer to the agency's fact-finding and drawing of inferences if they are supported by the record." (quoting *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67-69, 729 A.2d 376, 380-81 (1999))). Under this standard, we consider "whether a reasoning mind reasonably could have reached the

factual conclusion the agency reached." *State Ins. Comm'r v. Nat'l Bureau of Cas. Underwriters*, 248 Md. 292, 309, 236 A.2d 282, 292 (1967); *see also Surina*, 400 Md. at 681, 929 A.2d at 910 (explaining that under the substantial evidence standard courts examine whether the administrative record contains "such evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotation marks omitted) (quoting *Mayor and Aldermen of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 398, 396 A.2d 1080, 1089 (1979)).

Just as we defer to an agency's factual findings, we afford great weight to the agency's legal conclusions when they are premised upon an interpretation of the statutes that the agency administers and the regulations promulgated for that purpose. *Surina*, 400 Md. at 682, 929 A.2d at 911; *Noland*, 386 Md. at 572, 873 A.2d at 1154. This deference, however, "extends only to the application of the statutes or regulations that the agency administers." *Loyola College*, 406 Md. at 67, 956 A.2d at 174. When an agency's decision is necessarily premised upon the "application and analysis of caselaw," that decision rests upon "a purely legal issue uniquely within the ken of a reviewing court." *Id.* at 67-68, 956 A.2d at 174.

In this case [*i.e.*, in *Frey*], the Tax Court's decision required the application and analysis of cases interpreting the United States Constitution as well as the Maryland Constitution and Declaration of Rights. Under these circumstances, we evaluate an agency's legal conclusions to determine whether they are based upon an error of law, without deference to the agency's determination. *Id.* at 68, 956 A.2d at 174; *Surina*, 400 Md. at 683, 929 A.2d at 911; *Adventist Health Care, Inc. v. Md. Health Care Comm'n*, 392 Md. 103, 120, 896 A.2d 320, 331 (2006).

## DISCUSSION

## I. Statute of Limitations

The Maizels do not contend that they filed any of the six amended tax returns that are the subject of this appeal within the time limit imposed by TG § 13-1104(c)(1). But they argue strenuously that TG § 13-1104(j) expressly provides an exception to the generally applicable time limit, and, they contend, its plain language permitted them to

12

file their claims for refunds within one year after the United States Supreme Court issued its opinion in *Wynne I* on May 18, 2015. All of their amended returns were filed before May of 2016, and therefore, although all of the Maizels' amended returns (for which refunds were denied) were filed beyond the time limit prescribed by TG § 13-1104(c)(1), the Maizels assert that their refund claims should nevertheless be considered timely pursuant to the exception provided in TG § 13-1104(j). As noted above, that subsection states:

> Notwithstanding subsection (c) of this section, a claim for refund or credit for overpayment of income tax attributable to a right to a reduction in a person's Maryland income tax that is established by a decision of an administrative board or by an appeal of a decision of an administrative board may be filed within 1 year after the date of a final decision of the administrative board or a final decision of the highest court to which an appeal of a final decision of the administrative board is taken.

The Maizels contend that the plain language of this statutory provision clearly and unambiguously applies to their situation. They claim that they meet the definition of "a person" whose claim for refund or right to reduction in Maryland income tax liability was "established by . . . an appeal of a decision of an administrative board"—namely the appeal from the Tax Court's ruling in *Wynne I*. Because they meet that test, they contend, their refund claims were timely filed within one year after the final decision of the highest court to which the parties appealed the Tax Court's ruling in *Wynne I*.

The Comptroller, too, contends that "[t]he plain language of § 13-1104(j) is unambiguous." But, according to the Comptroller, this plain and unambiguous statute clearly establishes: "A taxpayer has one year to file a refund claim after that taxpayer receives a final decision from an administrative board or an appellate tribunal."

13

Although both parties to this appeal assert that TG § 13-1104(j) is unambiguous, we are unable to conclude, without adding to, or modifying, the words in the statute, that either party's interpretation is without a rational basis. Because the provision is reasonably capable of more than one meaning, it is ambiguous.

The ambiguity stems in large part from the reference to "*a person's* Maryland income tax" liability. The Maizels would read that language to apply to "*any* person" who might be able to assert a legal argument for a tax reduction based upon *any* ruling of *any* administrative agency at any time. The Comptroller would read that same language as applying only to "a person," as in one person, singular, whose Maryland tax liability was established by a specific administrative proceeding in which that taxpayer was a party.

In *Lewis v. State*, 348 Md. 648, 653-54 (1998), Judge Irma S. Raker explained that an ambiguity will be found when words of a statute are reasonably capable of more than one meaning. Writing for the Court of Appeals, she stated:

> In construing a legislative enactment, the paramount objective is to ascertain and give effect to the intent of the Legislature. *Harris v. State*, 344 Md. 497, 510, 687 A.2d 970, 976, *cert. denied sub nom. Koenig v. Maryland*, —— U.S. ——, 118 S.Ct. 605, 139 L.Ed.2d 492 (1997); *Tapscott v. State*, 343 Md. 650, 657, 684 A.2d 439, 442 (1996); *Frazier v. Warfield*, 13 Md. 279, 301 (1859). To discern legislative intent, we look first to the language of the statute, giving those words their ordinary and natural meaning. *Gardner v. State*, 344 Md. 642, 647-48, 689 A.2d 610, 612-13 (1997). When the plain meaning of the language is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, our inquiry is at an end. *Philip Electronics v. Wright*, 348 Md. 209, 216-17, 703 A.2d 150, 153 (1997); *Frank v. Baltimore County*, 284 Md. 655, 661, 399 A.2d 250, 254 (1979). If, however, the meaning of the plain language is ambiguous or unclear, we seek to discern legislative intent from surrounding

14

circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based. *Haupt v. State*, 340 Md. 462, 471, 667 A.2d 179, 183 (1995). As we recently observed in *Greco v. State*, 347 Md. 423, 429, 701 A.2d 419, 421 (1997), in the context of statutory construction, "ambiguity" is most accurately defined as "reasonably capable of more than one meaning."

When the words of a statutory provision are reasonably capable of more than one meaning, and we examine the circumstances surrounding the enactment of a legislative provision in an effort to discern legislative intent, we interpret the meaning and effect of the language in light of the objectives and purposes of the provision enacted. *Gargliano v. State*, 334 Md. 428, 435, 639 A.2d 675, 678 (1994); *see Kaczorowski v. City of Baltimore*, 309 Md. 505, 513-16, 525 A.2d 628, 632-33 (1987). Such an interpretation must be reasonable and consonant with logic and common sense. *Armstead v. State*, 342 Md. 38, 56, 673 A.2d 221, 229 (1996). In addition, we seek to avoid construing a statute in a manner that leads to an illogical or untenable outcome. *Greco*, 347 Md. at 429, 701 A.2d at 422; *Fraternal Order of Police v. Mehrling*, 343 Md. 155, 174, 680 A.2d 1052, 1062 (1996).

*Accord Webster v. State*, 359 Md. 465, 480 (2000).

We conclude that the language of TG § 13-1104(j) is ambiguous because it is "reasonably capable of more than one meaning," *Greco*, 347 Md. at 429, and we shall therefore consider the circumstances surrounding the enactment of the statutory provision.

Among the exhibits presented to the Tax Court were documents that reflected the apparent impetus for the General Assembly's decision to add subsection (j) to TG § 13-1104 in 2003. The Comptroller's version of the legislative history of TG § 13-1104(j) was summarized in the Notice of Final Determination that the Comptroller had sent to the Maizels on December 2, 2016. In that notice, which was an exhibit in the Tax Court, the

Comptroller rejected the Maizels' argument that their claims were timely filed pursuant to TG § 13-1104(j), and explained:

> Section 13-1104(j) is very limited in its application and the statute was very carefully worded to ensure it was not construed too broadly. The history behind the introduction of the bill and the Comptroller's comments support this fact. An article in the Frederick News Post dated May 25, 2001, explained the history of the bill as follows:
>
>> Commander Douglas Dellinger was dismissed from the U.S. Navy in 1990. He appealed the dismissal and nine years later an administrative panel ruled in his favor, reinstating him, retroactive to 1990. During the period at issue Maryland law exempted military personnel from paying state taxes. Thus, upon reinstatement, he became exempt from the taxes he had already paid to the state of Maryland. Because the ruling took so long Commander Dellinger's refund request was untimely. Commander Dellinger requested assistance from [his Maryland State] Senator, Alex Mooney. Senator Mooney understood that the request was untimely due to the three-year deadline imposed on refund requests. Senator Mooney responded with the introduction of a senate bill that was "meant to shield state taxpayers from the red tape of other bureaucracies." [(Quoting an article from the May 25, 2001 Frederick News Post captioned "*Mooney Says Veto was Personally Motivated*.")]
>
> The exception that was ultimately codified as section 13-1104(j) was introduced by Senator Mooney as Senate Bill 344 in the 2001 Maryland legislative session. It was vetoed by Governor Parris Glendening. In a letter dated May 17, 2001, to Mike Miller, Jr., President of the Senate, Governor Glendening stated he was vetoing the bill although the Office of the Comptroller reported that the bill would likely impact "one or two taxpayers a year." He explained that although the bill would apply in "extremely rare" cases, that he was concerned with the congruity of federal and State law. [Citing http://mgaleg.maryland.gov/webmga/frmMain.aspx?ys=2001rs/veto_letters /sb0344.htm]

* * *

16

. . . Governor Glendening's veto letter, and the history behind the introduction of the bill when read with the statutory language, evidence the limited application of the exception. The bill was introduced to afford relief to a member of the military whose tax status was in question for nine years pending the decision of an administrative board. . . .

The exception in section 13-1104(j) is applicable to the taxpayer who is pursuing the decision of an administrative board or an appeal of a decision of an administrative board, but not others who are not named in the appeal. The Maizels were not a party to *Wynne*, and are not entitled to an extension of the statute of limitations based on the result of an appeal to which they were not a party.

Other documents that were introduced in the Tax Court relative to the legislative history of TG § 13-1104(j)—which was finally enacted in 2003 as Chapters 71 and 72, Laws of Maryland 2003—included: (1) Senator Mooney's letter to the Comptroller's Compliance Division dated July 7, 2000, seeking its assistance regarding "the best way to revise the current law" to avoid "the unfairness" of Mr. Dellinger's case; (2) one page of an internal memorandum of the Comptroller's office dated July 13, 2000, with a subject heading of "Expansion of Statute of Limitations for non-IRS appeals," and referring to that issue as having been "raised by State Senator Alex X. Mooney on behalf of Douglas C. Dellinger"; (3) a hand-written memo dated July 20, 2000, to the Director of the Comptroller's Compliance Division, indicating a willingness to work with the "Senator in drafting legislation to correct problem in future"; (4) the first page of a letter dated November 15, 2000, from the Comptroller's office to Senator Alex Mooney, proposing language for an amendment to TG § 13-1104(c)(2) to provide for filing a claim for refund of an overpayment within one year after "a final decision of an administrative board . . . establishing the right of the person to a reduction in the person's taxable income"

17

(capitalization modified); (5) a letter dated February 21, 2001, from Douglas C. Dellinger to the Chair of the Senate Budget & Taxation Committee, urging passage of that session's Senate Bill 344 "to correct an inequity in the existing [tax] law" that came to light in Mr. Dellinger's personal experience because, "by the time the administrative board released its decision entitling me to [a] refund, it was too late per current regulations for the Comptroller to issue the tax refund"; (6) a letter dated February 3, 2003, from Comptroller William Donald Schaefer to the Chair of the Senate Budget & Taxation Committee, urging passage of Senate Bill 175—one of the bills that would ultimately become codified as TG § 13-1104(j)—to "correct an inequity in the existing law relating to the timely filing of a claim for refund of income tax" that could occur on "occasions in which a taxpayer's entitlement to a refund is established by a decision of a non-tax agency following proceedings that extend beyond the three-year filing deadline under Maryland law"; and (7) a Fiscal and Policy Note relative to Senate Bill 175, noting that the "bill is the result of two cases that have been under review by the Comptroller where taxpayers filed for a refund after the three-year period due to a dispute of their residency status," and stating that "only a few cases of this type occur each year" such that "the current amount of refunds that would be paid as a result of the bill is less than $10,000." No documents were introduced in the Tax Court to refute the Comptroller's contention that the intent of the General Assembly was to permit taxpayers such as Mr. Dellinger—who experienced a change of status as a result of an administrative proceeding that did not conclude within three years after his overpayment of taxes had

18

occurred—to seek a refund within one year after the final decision in that administrative process (including any appeal).

In light of the legislative history of this subsection of TG § 13-1104, we are persuaded that the Tax Court correctly ruled that TG § 13-1104(j) applies only to the specific taxpayers who were parties to a decision of an administrative body or an appeal of that decision, and therefore, did not extend the time limit established by TG § 13-1104(c)(1) for the Maizels to seek a refund based upon the defect in Maryland tax law highlighted in *Wynne I*.

## II. Due Process

The Maizels assert that, if TG § 13-1104(j) did not permit them to file their refund claim within the year after the Supreme Court's decision in *Wynne I*, then the State of Maryland has deprived them of their Fourteenth Amendment and Maryland constitutional rights to due process because (1) they were deprived of property (namely, the taxes they overpaid to the State pursuant to a provision that violated the dormant Commerce Clause), and (2) the State failed to give adequate notice to them of their right to a refund after the judicial decisions in *Wynne I* confirmed the constitutional defect in Maryland's tax law. The Maizels assert in their brief that "the State of Maryland denied Appellants a meaningful opportunity to recover the unlawful taxes paid in respect of the Relevant Years by failing over a four-year period [beginning with the circuit court's ruling in favor of the Wynnes in 2011] to notify them, directly or by means of any public outreach to taxpayers, of the fact that multiple courts of competent jurisdiction had ruled that Appellee's denial of millions of Dollars of tax credits to Appellants and other similarly

19

situated taxpayers was unconstitutional." We see no merit in the Maizels' due process arguments.

The Maizels refuse to recognize that the State of Maryland did nothing to preclude them from asserting the same challenge to Maryland's tax law that the Wynnes successfully pursued. The Wynnes' argument that Maryland's treatment of income taxes that taxpayers—including the Maizels—paid to other states discriminated against interstate commerce was not based upon a novel legal principle that was unforeseeable until first raised by the Wynnes relative to their 2006 Maryland tax returns. As Justice Alito observed in the Supreme Court's opinion affirming the ruling of the Maryland Court of Appeals, there was long-standing precedent to support the result in *Wynne I*. Writing for the 5-4 majority, Justice Alito stated, 575 U.S. at 549-50:

> Under our precedents, the dormant Commerce Clause precludes States from "discriminat[ing] between transactions on the basis of some interstate element." *Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 332, n. 12, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977). This means, among other things, that a State "may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State." *Armco Inc. v. Hardesty*, 467 U.S. 638, 642, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984). "Nor may a State impose a tax which discriminates against interstate commerce either by providing a direct commercial advantage to local business, or by subjecting interstate commerce to the burden of 'multiple taxation.'" *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959) (citations omitted).

20

The Supreme Court stated: "Our existing dormant Commerce Clause cases all but dictate the result reached in this case by Maryland's highest court." *Id.* at 550. The Court then cited three cases that it considered "particularly instructive," *id.*, namely, *J.D. Adams Mfg. Co. v. Storen*, 304 U.S. 307 (1938); *Gwin, White & Prince, Inc. v. Henneford*, 305 U.S. 434 (1939); and *Central Greyhound Lines, Inc. v. Mealey*, 334 U.S. 653 (1948). The Court explained: "In all three of these cases, the Court struck down a state tax scheme that might have resulted in the double taxation of income earned out of the State and that discriminated in favor of intrastate over interstate economic activity. … Maryland's tax scheme is unconstitutional for similar reasons." 575 U.S. at 551.

In other words, the legal precedent that enabled the Wynnes to prevail in *Wynne I* had been available to Maryland taxpayers—including the Maizels—since at least 1948, long before the Maizels paid any of the taxes they sought to recover in this case. The fact that they did not assert that legal argument until more than three years after they had paid the taxes is not due to the lack of an available remedy provided by the State of Maryland.

Nor can the State be faulted for failing to notify individual multi-state taxpayers of Supreme Court jurisprudence regarding the dormant Commerce Clause that had been the topic of litigation and judicial opinions for decades. *Cf. City of West Covina v. Perkins*, 525 U.S. 234, 241 (1999) (Stating that, unlike the obligation of law enforcement agents to give notice of their *seizure* of property, "[n]o similar rationale justifies requiring individualized notice of state-law remedies which, like those at issue here, are established by published, generally available state statutes and case law.").

21

And the enforcement of a reasonable statute of limitations—such as the three-year limit imposed upon refund claims by TG § 13-1104(c)(1)—does not deprive a taxpayer of due process. As the Maryland Court of Appeals observed in *Wynne II*, 469 Md. at 82 n.26, "the Supreme Court in *McKesson* [*Corp. v. Division of Alcoholic Beverages and Tobacco, Fla. Dept of Business Regulation*, 496 U.S. 18 (1990),] . . . indicated that a state could place various constraints on any refunds, such as limiting them only to taxpayers who paid the tax under protest or by enforcing a relatively short period of limitations for claiming a refund. 496 U.S. at 50, 110 S.Ct. 2238."

In sum, we perceive no merit in the Maizels' contentions that they suffered a denial of due process.

### III. Discovery

The Maizels' final argument is that the Tax Court abused its discretion by not sanctioning the Comptroller for failing to provide a pre-trial privilege log pursuant to Maryland Rule 2-402(e)(1) and for withholding certain documents based upon claims of privilege. We conclude that Maryland Rule 2-402 does not apply to proceedings in the Tax Court, and the Tax Court did not abuse its discretion in the ruling it made with respect to the Comptroller's response to the Maizels' subpoena.

"The Maryland Rules pertaining to pre-trial discovery in circuit court cases do not, generally, apply to administrative proceedings." *Hammen v. Baltimore County Police Dep't.*, 373 Md. 440, 457 (2003); *accord Montgomery County v. Supervisor of Assmts.*, 275 Md. 58, 62 n.4 (1975) ("Appellees' reliance upon [Maryland Rule 208] is misplaced since the Maryland Rules do not govern procedures before the Tax Court."). *See*

22

Maryland Rule 1-101(b), stating: "Title 2 [of the Maryland Rules] applies to civil matters *in the circuit courts*, except for Juvenile Causes under Title 11 of these Rules and except as otherwise specifically provided or necessarily implied." (emphasis added).

The scope of discovery in Tax Court cases is limited. TG § 13-521 permits a party to "take a deposition in or out of the State in the manner provided by law for taking depositions in a civil case," and permits a party to request that the Tax Court issue a subpoena commanding a witness to appear and produce "any pertinent document" at the deposition. But the Maizels did not subpoena any witnesses to attend a deposition.

Instead, the Maizels did request, and the Tax Court did issue pursuant to TG § 13-520(b)(2), a subpoena duces tecum for a Custodian of Records of the Comptroller to appear and produce documents at the merits hearing in the Tax Court. Among the documents the subpoena requested were "copies of any and all written communications" "relating to whether, when and/or how" the Comptroller notified taxpayers of their "refund rights" growing out of the *Wynne I* litigation. The Maizels complain that the Comptroller violated Maryland Rule 2-402(e)(1) by failing to produce documents, and failing to provide a detailed privilege log until after the hearing on the merits had closed.

When the parties appeared for the merits hearing in the Tax Court on September 19, 2017, Mr. Maizel asked the court at the outset to compel disclosure of minutes of a Deputy Comptroller's staff meeting that had been withheld due to a claim of executive privilege. Counsel for the Comptroller represented to the court and the Maizels that all pertinent documents had been provided to the Maizels other than four privileged documents: (1) minutes of a staff meeting in the Comptroller's office at which the

23

attendees discussed Comptroller "business and policy"; and (2) three documents in which counsel from the Attorney General's office were providing privileged legal advice and comment. But counsel for the Comptroller further represented that, otherwise, "anything that was out there that we had that was in a document form that was responsive to a document request was produced."

After listening to argument from both parties, the Tax Court said to Mr. Maizel: "I'm going to suggest the remedy for you [for] today is I would not let them present any additional documents to Court that they haven't already disclosed to you." *Cf.* TG § 13-522, which permits the Tax Court to apply to the circuit court for *that court* to issue a show cause order and potentially impose sanctions for contempt *in the circuit court*.

Mr. Maizel objected that the suggested remedy would not redress the fact that the Comptroller had withheld the documents identified in its privilege log. Mr. Maizel urged the Tax Court to compel disclosure of the minutes identified in the privilege log in particular, noting the privilege log was lacking the date of the communications and the identities of the parties to the communications. He acknowledged, however, that the Comptroller's production of documents had included an e-mail that referred to attached minutes dated April 24, 2014. Mr. Maizel also stated that, although he had hoped to have the information before the day of the merits hearing, "I don't want to postpone this any more."

Counsel for the Comptroller then stated that the meeting that was the subject of the withheld minutes was a meeting of "the assistant deputy director of the [C]omptroller's

office and her directors of the various divisions discussing [C]omptroller business and policy there."

Mr. Maizel returned to his complaint regarding the adequacy of the privilege log, stating: "But where a privilege[] log is produced, it's my understanding that that log, at least under the federal rules . . . needs to indicate who the communications were between and when they happened." At that point, counsel for the Comptroller offered to provide that missing information, stating:

> I'm more than happ[y] to give those dates if they were missing or the names of the parties.
>
> In terms of the director's meeting, . . . there's an e-mail in there [*i.e.*, the documents previously produced] . . . that gives you the date and the [names of the] people that were there because the minutes were distributed to those people. And we apologize if the log didn't have that information on it. The other two that had to do with the e-mails that the attorney-client privilege was related to would have been communications. . . . I was the attorney on those particular communications and the dates[,] again we can give that to Mr. Maizel.

Mr. Maizel began to request that the court "ask them to produce a log that shows—." Counsel for the Comptroller volunteered: "We will voluntarily do that, Your Honor. You don't even have to worry about that." The court and counsel then moved on to other motions. The Maizels did not request any further relief regarding the Comptroller's claims of privilege. The hearing officer directed counsel for the Comptroller to draft orders after the hearing disposing of all of the motions decided that day.

The hearing then proceeded, without any objection from either party, with the evidentiary phase. At the conclusion of the parties' presentation of evidence, the Maizels

did not request that the record remain open for them to present additional evidence and argument regarding the Comptroller's claims of privilege. Both parties made closing arguments, and the hearing officer provided an oral decision that same day (September 19, 2017). On October 20, 2017, the Comptroller provided the Maizels a revised privilege log, listing the same four documents and document identification numbers, and reasons for claiming privilege, adding brief descriptions, the document's date (although three were described as "undated"), and the identity of the author or authors and the recipients.

> In their brief in this Court, the Maizels assert:

> The Tax Court's refusal to hold Appellee to its *DuPont* [*v. Forma-Pak*, 351 Md. 396, 406 (1998),] privilege burden constitutes an error sufficiently serious to warrant reversal under both *Wilson v. John Crane*, 385 Md. 185, 198-99 (2005) and *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312-13 (1997) (reversal of the trial court's discovery rulings required "*where it is apparent that some serious error or abuse of discretion or autocratic action has occurred.*").

(Emphasis added by the Maizels.) They ask that "this Court disallow all Appellee's privilege objections," or alternatively, "specifically disallow Appellee's claim of executive/deliberative privilege and compel production of the withheld document[,]" *i.e.*, the minutes dated April 24, 2014.

We conclude that the Maizels waived these remedies by failing to either request another postponement of the merits hearing, or at least ask that the record be held open until after the Comptroller's revised privilege log had been received and they had an opportunity to seek additional relief from the Tax Court. Because the Maizels asked for nothing further after counsel for the Comptroller agreed to supplement the original

26

privilege log on some unspecified date, the Tax Court did not abuse its discretion in proceeding to decide the case based upon the record made at the hearing.

Moreover, we fail to see how the Tax Court's failure to order the Comptroller to produce the minutes of a meeting held on April 24, 2014, prejudiced the Maizels. Any abuse of discretion or error on the part of the hearing examiner appears to be harmless at most. *See Consolidated v. Standard*, 421 Md. 210, 219 (2011) ("Even when a trial court is found to have abused its discretion, it has long been the settled policy of this [C]ourt not to reverse for harmless error." (internal quotation marks and citations omitted)); *Flores v. Bell*, 398 Md. 27, 33 (2007) (appellate courts of Maryland "will not reverse a lower court judgment if the error is harmless" and "[t]he burden is on the complaining party to show prejudice as well as error." (footnote omitted)).

The Maizels' asserted reason for needing to see these documents is based upon a suspicion that the documents could have supported their hypothesis that the Comptroller's office deprived them of due process because it affirmatively worked to avoid refund claims by withholding public notice of the Wynnes' success in the courts. The Maizels assert in their brief that the Comptroller's decision not to notify individual taxpayers was "the result of a deliberate decision to withhold or delay furnishing such information to taxpayers—all while the three-year statute of limitations worked to extinguish taxpayer refund claims." They surmise that this conspiracy to deprive them of their due process right to refunds might have been confirmed by the minutes from the Deputy Comptroller's meeting.

Counsel for the Comptroller made clear during the hearing in the Tax Court, and in the revised privilege log, that the date of the meeting with the Deputy Comptroller that was the subject of the minutes took place on April 24, 2014. In light of the fact that the Court of Appeals filed a reported opinion in *Wynne I* on January 28, 2013, any argument that taxpayers had no public notice of the Wynnes' success after that date due to a nefarious scheme of the Comptroller is devoid of merit.

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**